- You have the hardware and software described above, an active email account, and you can (1) access, view and print on paper or save on your computer this electronic Consent Agreement and the electronic documents and (2) access the web sites described above, including their content, in either HTML or PDF formats, as applicable.

- Your electronic signature on any of the electronic documents, including this Consent Agreement, will bind you to that document in the same manner and to the same extent as if you had signed a paper copy of the document with an ink pen. You will not contest the validity or enforceability of any electronic document you receive or electronically sign by reason of the document and your signature being in electronic form.

- You will contact us to report any problem with your enrollment.

## RETAIL LEASE AGREEMENT

between

Kentlands Retail, Inc.
(Landlord)

and

Not Your Average Joe's, Inc.
(Tenant)

Kentlands Square Shopping Center
Gaithersburg, Maryland



PLAINTIFF'S
EXHIBIT

## REFERENCE PAGES

Shopping Center: The Kentlands Square Shopping Center located on Kentlands Boulevard in Gaithersburg, Maryland. The Shopping Center includes: (i) the real estate outlined on Exhibit A and legally described on Exhibit A-2, as each are hereto attached and incorporated herein; (ii) the buildings and improvements constructed on such real estate, together with all alterations and additions thereto; and (iii) such improvements as may be constructed on such real estate after the date hereof. Landlord reserves the right to change the number and location of buildings, building dimensions, and the Common Areas and to make such other changes as are provided in Section 3.05 hereof, subject to the terms of this Lease.

Landlord: Kentlands Retail, Inc.

Tenant: Not Your Average Joe's, Inc.

Trade Name of Tenant: Not Your Average Joe's

Premises: That portion of Shopping Center which is "cross-hatched" on Exhibit A, attached hereto. Subject to adjustment pursuant to Section 3.12 herein, the Premises contain approximately 6,437 square feet of gross rentable area and known as Suites 13, 14 and 15, being approximately 65.59 feet of frontage and approximately 100 feet of depth extending to the center line of the party walls and to the exterior faces of all other walls, but reserving and excepting to Landlord the use of the roof and exterior walls (other than store fronts) and the right to install, maintain, use, repair, and replace pipes, ducts, conduits, wires, and appurtenant fixtures, leading through the Premises in locations which will not materially interfere with Tenant's use thereof, drawings of which existing suites are as set forth on Exhibit A-3, attached hereto.

Building: The retail building in the Shopping Center within which the Premises is located.

Initial Term: Subject to §§1.01 and 1.05 of this Lease, the period of time commencing on the Commencement Date and terminating one hundred twenty (120) months after the last day of the calendar month in which the Rent Commencement Date occurs.

Commencement Date: The date on which this Lease is fully executed by Landlord and Tenant.

Rent Commencement Date: The earlier of (i) the date Tenant opens for business at the Premises or (ii) one hundred fifty (150) days after the later of: (x) Landlord's delivery of the entire Premises (including the Occupied Space (defined below)) and the Patio Space to Tenant with Landlord's Work (as defined on Exhibit E) substantially complete (the "Delivery Date"), or (y) the date that is one hundred twenty (120) days following the date on which Landlord approves Tenant's Plans pursuant to Section 5.01 herein, or (iii) March 1, 2012.

Permitted Use: The Premises shall be used only for the operation of a full service sit-down restaurant that offers alcoholic beverages, including the sale of food for off-premises consumption (the "Permitted Use") and for no other use. Notwithstanding the foregoing or any provision in this Lease to the contrary, in no event shall Tenant use or allow the use of the Premises for any use or purpose that violates the exclusives specified in Exhibit D, attached hereto and incorporated herein.

Minimum Hours: 12:00 p.m. to 9:00 p.m. on Monday through Saturday, and 12:00 p.m. to 5:00 p.m. on Sunday, each week during the Term.

i

**Minimum Rent:**

| Year(s) | Per Square Foot | Annual Amount | Monthly Amount |
|---------|----------------|---------------|----------------|
| 1-5 | $37.00 | $238,169.00 | $19,847.42 |
| 6-10 | $40.70 | $261,985.90 | $21,832.16 |

**Common Area Maintenance:** Pro-rata share subject to Section 2.03 herein.

**Percentage Rent Fraction:** N/A

**Breakpoint:** N/A

**Proportionate Share:** Calculation set forth on Exhibit "B", attached hereto and made a part hereof.

**Security Deposit:** N/A

**Initiation Fee** (for Merchant's Association): N/A.

**Monthly Dues** (to Merchant's Association): Intentionally deleted.

**Notice Address** (for Landlord): c/o LaSalle Investment Management, 100 East Pratt Street, 20th Floor, Baltimore, Maryland 21202, Attention: Asset Manager – Kentlands Shopping Center, with a copy to CB Richard Ellis, Inc., 250 West Pratt Street, Suite 1700, Baltimore, Maryland 21201.

**Notice Address** (for Tenant): 151 Campanelli Drive, Unit C, Middleborough, MA 02346 Attn: Joe McGuire, with a copy to Goulston & Storrs, P.C. 400 Atlantic Avenue, Boston, MA 02110, Attn: Not Your Average Joe's.

**Broker of Record:** KLNB/Retail, which is Landlord's Broker, and StreetSense, which is Tenant's Broker.

**Construction of the Space Improvements:** The Space Improvements are to be constructed by Tenant in accordance with Section 5.01 hereof.

**Improvement Allowance:** $37.00 per square foot of the Premises, which equals $238,169, payable as set forth in Section 5.01 herein.

ii

## GLOSSARY

| Defined Term | Location of Definition |
|---|---|
| ADA | §2.04 |
| Additional Rent | §2.06 |
| Breakpoint | Reference Pages |
| Broker of Record | Reference Pages |
| Building | Reference Pages |
| Business Days | §5.01 |
| Commencement Date | Reference Pages |
| Common Areas | §3.05 |
| Common Area Expenses | §2.04 |
| Event of Default | §14.01 |
| Force Majeure | §5.01 |
| Gross Receipts | §2.02 |
| Hazardous Materials | §13.01 |
| HVAC | §6.01 |
| Improvement Allowance | Reference Pages |
| Initiation Fee | Reference Pages |
| Landlord | Reference Pages |
| Lending Institution | Article XVIII |
| Merchant's Association | §3.06 |
| Minimum Hours | Reference Pages |
| Minimum Rent | Reference Pages |
| Monthly Dues | Reference Pages |
| Mortgage | §12.01 |
| Mortgagee | §12.01 |
| Percentage Rent | §2.02 |
| Percentage Rent Fraction | Reference Pages |
| Permitted Use | Reference Pages |
| Premises | Reference Pages |
| Proportionate Share | Reference Pages |
| Real Estate Taxes | §2.03 |
| Relocation | §3.07 |
| Rent | §2.06 |
| Rules and Regulations | Article XI |
| Security Deposit | Reference Pages |
| Shopping Center | Reference Pages |
| Space Improvements | §5.01 |
| Structural Elements | §3.10 |
| Substitute Amount | §14.04 |
| Tenant | Reference Pages |
| Term | Reference Pages |
| Trade Name of Tenant | Reference Pages |
| Transfer | §10.01 |
| Year | §1.01 |

## RETAIL LEASE AGREEMENT

THIS RETAIL LEASE AGREEMENT (this "Lease") is made this 20 day of May, 2011, by and between the KENTLANDS RETAIL, INC. ("Landlord") and NOT YOUR AVERAGE JOE'S, INC., a Delaware corporation ("Tenant").

For and in consideration of the rents, covenants, agreements and conditions herein contained on the part of Tenant to be paid, kept, observed and performed, Landlord does hereby lease to Tenant, and Tenant does hereby lease from Landlord, the Premises, subject to (a) all the terms and conditions set forth in this Lease, and (b) all liens, encumbrances, Mortgages (as defined below), easements, restrictions, and covenants, and all zoning and other laws, rules, ordinances, and regulations, now or hereafter affecting or governing the Premises or the rest of the Shopping Center. The Reference Pages are hereby incorporated into the terms of this Lease.

### ARTICLE I - TERM

§1.01. Length. Tenant's lease of the Premises shall be for the Term, which begins on the Commencement Date. If Tenant enters into occupancy of the Premises prior to the Rent Commencement Date for the purpose of constructing improvements or installing fixtures therein (and without conducting business therein), then all terms and conditions of this Lease (except those regarding (i) the payment of Minimum Rent, Real Estate Taxes, and Common Area Expenses and (ii) the opening for business and operation of the Premises) shall apply to such occupancy. "Year" means a consecutive period of twelve (12) months which begins on the Rent Commencement Date or on an anniversary of the Rent Commencement Date. However, if the Rent Commencement Date is not the first day of a calendar month, then, notwithstanding anything contained in this Lease to the contrary (a) the first Year shall be extended to be the period from the Rent Commencement Date until the end of the first twelve (12) full calendar months thereafter, (b) the Minimum Rent for the first year shall be increased on a per diem basis to include that extension period, (c) each succeeding Year shall begin at the expiration of the previous Year, and (d) the Term shall be extended to include that extension period.

§1.02. Confirmation. After the Rent Commencement Date, Landlord may submit to Tenant a statement specifying the actual Rent Commencement Date and the actual expiration date of the Term in the form attached hereto as Exhibit G. Within ten (10) days after such submission, Tenant shall execute that statement, and return it to Landlord, with any corrections that are necessary.

§1.03. Surrender. At the expiration of the Term or any earlier termination of this Lease, Tenant shall (a) promptly surrender to Landlord possession of the Premises, including (i) any and all permanent fixtures and other improvements, all in good order, condition and repair (ordinary wear and tear, and damages due to casualty and condemnation and failure of Landlord to perform its maintenance and repair obligations hereunder excepted), which improvements shall include but not be limited to built-in furniture and equipment, wires, pipes and other conduits; (b) remove, from the Premises, Tenant's signs, goods and trade fixtures and such of Tenant's furniture, removable fixtures and equipment that are not to remain in the Premises under clause (a) of this Section; (c) repair in a good and workmanlike manner any and all damage to the Premises and the Shopping Center caused by such removal; (d) surrender to Landlord all keys to or for the Premises; and (e) give Landlord the combination of any and all locks, safes and vaults in the Premises. Tenant understands that Landlord's damages on account of any breach of Tenant's obligations under the foregoing provisions may include those arising from the claims of any successor occupant on account of any resulting delay, subject to Sections 1.04 and 19.27 below. In addition to the foregoing damages, any property of Tenant remaining at the Premises after the expiration or earlier termination of this Lease and not

removed within ten (10) days following receipt of written notice from Landlord to remove the same shall irrevocably be deemed abandoned and may be removed, kept or disposed of by Landlord as Landlord deems appropriate, in Landlord's sole and absolute subjective discretion.

§1.04    Holding Over.  If Tenant continues to occupy the Premises beyond the expiration of the Term or any earlier termination of this Lease, Tenant shall be deemed to be occupying the Premises as a tenant from month-to-month and such occupancy shall be subject to all of the same terms and conditions as are contained in this Lease, as adjusted for a month-to-month tenancy, except that the Minimum Rent payable during the period of such occupancy shall be equal to one point two five (1.25) times the Minimum Rent that was last in effect during the Term. However, the foregoing shall not be deemed in any way to limit or impair Landlord's right to evict Tenant immediately or to exercise any of Landlord's other rights and remedies under the provisions of this Lease or applicable law on account of such continued occupancy of the Premises.  Also notwithstanding the foregoing, Tenant shall be liable for any and all direct damages and expenses that Landlord may sustain by virtue of Tenant's holding over, including, but not limited to, Landlord's reasonable attorneys' fees.

§1.05    Extensions of the Term of the Lease.  The Initial Term of the Lease shall be extended subject to the terms set forth on Exhibit C, attached hereto. The Initial Term and each Extension Period for which the option shall have been duly exercised hereunder, if applicable, shall be collectively referred to as the "Term".

§1.06    (Patio Space.  During the Term, Tenant shall have the right to install and operate, at its sole cost and expense, [illegible] ...

§1.07    (Permit Contingency.  Tenant's obligations under this Lease are conditioned upon Tenant's obtaining any permits and/or liquor license, conditional use permits, building permits, health permits, variances and other governmental approvals (collectively, "Government Approvals") that are required by applicable law to enable Tenant legally to (a) to construct the Space Improvements (defined below) in the Premises in accordance with the terms of this Lease; (b) to conduct its business in the Premises in accordance with the terms of this Lease, and (c) to create and operate the Patio Space as outlined on Exhibit A-1, attached hereto. [remainder illegible]

2

right to terminate this Lease upon thirty (30) days prior written notice to Landlord (unless during said thirty (30) day period, Tenant obtains the Governmental Approvals). After a termination hereunder, neither party shall have any rights or liabilities under this Lease and Landlord shall return any prepaid amounts, if any, to Tenant.

Provided that in no event shall Tenant's obligation to begin paying Rent on the Rent Commencement Date be extended, if Tenant has not received the Government Approvals on terms satisfactory to Tenant on or before the Permit Deadline specified in the preceding paragraph, then Tenant shall have the option, at Tenant's sole discretion exercisable by written notice to Landlord given no less than five (5) business days prior to the then-current Permit Deadline, to extend the Permit Deadline for up to two (2) periods of thirty (30) days each. No exercise by Tenant of its right to extend the Permit Deadline, as permitted in this paragraph, shall negate Tenant's right to terminate this Lease if Tenant subsequently fails to obtain the Government Approvals on terms satisfactory to Tenant.

§1.08   Lease Contingency.   Tenant acknowledges and agrees that a portion of the Premises consisting of approximately 1,500 square feet (the "Occupied Space") is currently occupied by an existing tenant and that Landlord's ability to deliver the entire Premises to Tenant is contingent upon Landlord recovering possession of the Occupied Space, terminating such tenant's existing lease and relocating such existing tenant to a space in the Shopping Center acceptable to such existing tenant. Landlord covenants and agrees to use all commercially reasonable efforts, at Landlord's expense, to relocate the existing tenant in order to obtain possession of the Occupied Space as soon as possible following full execution of this Lease. In the event that Landlord has not delivered the entire Premises (including the Occupied Space) within one hundred twenty (120) days after the full execution of this Lease, then Landlord shall not be deemed to be in default hereunder, but Tenant shall have the right to terminate this Lease upon written notice to Landlord. Notwithstanding the foregoing, if within five (5) days after Landlord's receipt of the termination notice, Landlord provides an extension request to Tenant with reasonable evidence of its ability to deliver the Occupied Space within thirty (30) days, then the contingency period shall extend for such additional thirty (30) day period. In the event of a termination under this Section 1.08, this Lease shall terminate upon such notice and the parties shall have no further rights or obligations to one another. In the event that Tenant does not terminate this Lease as hereinabove provided, but despite Landlord's commercially reasonable efforts, Landlord has not delivered possession of the Premises to Tenant within one hundred eighty (180) days after the full execution of this Lease, then Landlord shall not be deemed to be in default hereunder, but this Lease shall automatically terminate, and in said event, the parties shall have no further rights or obligations to one another under this Lease.

## ARTICLE II - RENT

§2.01   Minimum Rent.   Tenant shall pay to Landlord the respective amount(s) of Minimum Rent set forth on the Reference Pages.

§2.02   Real Estate Taxes.   Tenant shall pay to Landlord, Tenant's Proportionate Share of the Real Estate Taxes applicable to the Shopping Center for the Term, subject to §2.04 hereof. "Real Estate Taxes" means all real estate taxes and assessments, general and special, ordinary and extraordinary, foreseen and unforeseen, including, without limitation, real property taxes, assessments, sewer rents and connection charges, ad valorem charges, water rents and connection charges, front foot benefit charges, all other government impositions in the nature of any of the foregoing, and all costs and expenses (including reasonable attorneys' fees and costs of court and administrative proceedings) incurred in contesting such taxes and assessments. Notwithstanding

3

the foregoing, Real Estate Taxes shall not include (a) any inheritance, estate, succession, transfer, gift, franchise, or capital stock tax; (b) any gross or net income taxes; (c) any excise taxes imposed upon Landlord based upon gross or net rentals or other income received by it; (d) assessments liened against the Shopping Center prior to the Rent Commencement Date. Landlord may institute any proceedings with respect to the assessed valuation of the Shopping Center or any part thereof, and Tenant shall, if and as requested by Landlord, cooperate with, and participate in, such proceedings, and shall reimburse Landlord for its Proportionate Share of such reasonable expense within thirty (30) days after written demand therefor. If, after Tenant shall have made the required payment of Real Estate Taxes hereunder, Landlord shall receive a refund of any portion thereof, then, after Landlord's receipt of such refund, Landlord shall adjust Tenant's Statement (as defined in Section 2.05(c) hereof) to reflect the addition of Tenant's Proportionate Share of the difference between that refund, less one hundred ten percent (110%) of all costs and expenses (including, but not limited to, reasonable attorneys' and appraisers' fees) expended or incurred in obtaining that refund [the additional ten percent (10%) being intended to compensate Landlord for its overhead in relation thereto]. Tenant may not institute any proceedings with respect to the assessed valuation of the Shopping Center or any part thereof.

§2.03    Common Area Expenses.  In addition to the foregoing, Tenant shall pay, to Landlord, for each Year (or part Year) of the Term a Proportionate Share of the Common Area Expenses for such Year.  "Common Area Expenses" means all expenses and costs incurred in connection with the management, maintenance, repair, replacement and operation of all improvements and Common Areas of the Shopping Center and/or any areas adjacent thereto for which Landlord is legally obligated to contribute, including but not limited to the following: (1) costs of all wages and salaries of all employees engaged in the operation and maintenance of those improvements and Common Areas, including but not limited to payroll taxes, insurance and benefits; (2) costs of all supplies and materials used in the operation, maintenance, repair, and replacement of those improvements and Common Areas; (3) costs of all utilities (including surcharges), including but not limited to water, sewer, electricity and gas for the Common Areas of the Shopping Center; (4) costs incurred under all maintenance and service agreements for the Shopping Center, including but not limited to security, trash removal, snow removal and landscaping; (5) costs of any and all insurance relating to those improvements and Common Areas, including but not limited to the costs of casualty and liability insurance; (6) costs of all repairs, replacements and general maintenance to those improvements and Common Areas, provided that any capital expenditures shall be amortized on a straight line basis over the useful life of the improvement for which the expenditure is made; (7) all property management fees and expenses; (8) costs of all audit and accounting services related to the operation of the Shopping Center; (9) costs of any and all improvements required or made necessary by laws, rules, regulations, orders, and ordinances or changes in law thereto including, without limitation, the Americans with Disabilities Act of 1990, the regulations issued thereunder, and the Accessibility Guidelines issued pursuant thereto, as the same may be modified, amended or supplemented (the "ADA") provided that any capital expenditures in connection with such improvements shall be amortized on a straight line basis over the useful life of such improvement; (10) costs of any and all service agreements for maintenance of any HVAC systems, roofs or other facilities or equipment; and (11) the costs of any and all licenses and permits required by any public authority for the operation of the Shopping Center, as well as a ten percent (10%) administrative fee based on the aggregate of Common Area Expenses.  However, notwithstanding the above, "Common Area Expenses" do not include: (a) principal, interest or other debt service payments; (b) any expenses paid by any tenant directly to third parties, or as to which Landlord is otherwise reimbursed by any third party, other tenant, or by insurance proceeds; (c) leasing commissions, brokerage fees, costs, disbursements, and other expenses incurred for leasing, renovating or improving space for specific or prospective tenants; (d) costs (including permit, license, and inspection fees) incurred in renovating, improving, decorating,

painting, or redecorating space for specific or prospective tenants; (e) Landlord's cost of electricity or other service sold to tenants for which Landlord is to be reimbursed as a charge over the Rent and Additional Rent payable under the leases with those tenants; (f) depreciation and amortization on the Building; (g) costs, including all legal fees and expenses incurred because the Landlord or another tenant violated the terms of any lease; (h) overhead and profit paid to subsidiaries or affiliates of Landlord for management or interest or penalties on debt or amortization payments on mortgages or deeds of trust or any other debt for borrowed money; (i) ground rents; (j) repairs or other work needed because of fire, windstorm, or other casualty or cause insured against by Landlord to the extent paid by Landlord's insurance; (k) the costs of any item properly chargeable to a capital account for the initial cost of construction of the Building; (l) intentionally deleted; (m) expenses for the defense of the Landlord's title to the Property; (n) structural repairs and replacements; (o) charitable, lobbying, special interest or political contributions; (p) any amounts expended by Landlord to comply with any Environmental Laws in existence prior to the Commencement Date; (q) costs to correct original or latent defects in the design, construction or equipment of the Shopping Center; (r) any expenses incurred (i) to comply with any governmental laws, regulations and rules in existence prior to the Commencement Date or any court order, decree or judgment including, without limitation, the Americans with Disabilities Act; or (ii) as a result of Landlord's alleged violation of or, failure to comply with any governmental laws, regulations and rules or any court order, decree or judgment; (s) cost of the initial stock of tools and equipment for operation, repair and maintenance of the Shopping Center; (t) amounts billed (directly or indirectly) for salaries, overhead and administrative and/or management fees, office expenses, rent and office supplies which (i) are duplicative; or (ii) do not represent actual costs incurred for actual services, or (u) Real Estate Taxes (as defined in Section 2.02).

Landlord shall keep records showing all expenditures incurred as Common Area Expenses and Real Estate Taxes for each calendar year for a period of two (2) years following each year, and such records shall be made available for inspection and photocopying by Tenant and/or its agents during ordinary business hours of the Shopping Center upon at least five (5) days prior written notice.

Notwithstanding anything to the contrary contained herein, Tenant's Proportionate Share of Common Area Expenses, other than that portion attributable to any costs for Common Area utility charges, insurance, security and snow and ice removal (collectively, the "Uncontrollable Costs"), for any given Year shall not be more than the amount of expenses paid by Tenant for the immediately preceding Year, other than that portion attributable to Uncontrollable Costs, increased by five percent (5%).

Notwithstanding anything to the contrary set forth herein, Tenant's Proportionate Share of Common Area Expenses and Real Estate Taxes for the period commencing on the Rent Commencement Date through the first Year shall not exceed $5.41 per square foot.

§2.04    Adjustment. Notwithstanding anything in this Lease to the contrary, for purposes of determining Tenant's Proportionate Share of Real Estate Taxes and Common Area Expenses, any or all of the following adjustments may, at Landlord's option, be made, from time to time, to the fraction used as Tenant's Proportionate Share to the extent that any item of Real Estate Taxes or Common Area Expenses relates to less than the entire Shopping Center, then the denominator used in determining Tenant's Proportionate Share with respect to such particular item of Real Estate Taxes. or Common Area Expenses may be changed to be the rentable square footage of the building(s) and other property to which the particular item of Real Estate Taxes or Common Area Expenses relates.

5

§2.05    When Due and Payable.

(a)    All rent, charges, costs, fees, expenses and other sums payable by Tenant under this Lease, except Minimum Rent, are also rental obligations and shall be referred to hereinafter as "Additional Rent".   All Minimum Rent and Additional Rent are sometimes hereinafter together referred to as "Rent".

(b)    Beginning on the Rent Commencement Date, the Minimum Rent for each Year during the Term shall be due and payable in twelve (12) consecutive, equal monthly installments, in advance, on the first day of each calendar month during the Term. Furthermore, if the Rent Commencement Date is not the first day of a calendar month, then the Minimum Rent for the period commencing with and including the Rent Commencement Date until and including the last day of the first full calendar month thereafter shall be pro-rated on the basis of the actual number of days in such period and shall be due and payable on the Rent Commencement Date.

(c)    Tenant shall pay all other Additional Rent within thirty (30) days after being billed therefor by Landlord.   However subject to Section 2.05(d) below, notwithstanding the foregoing, Landlord may at its discretion by giving notice thereof to Tenant (1) make, from time to time during the Term, a reasonable estimate of the amount of Additional Rent that may become due for any Year; (2) require Tenant to pay to Landlord such Additional Rent in equal installments at the time and in the manner that Tenant is required hereunder to pay monthly installments of Minimum Rent; and (3) increase or decrease, from time to time during such Year, the amount initially estimated for such Year.  In such event, Tenant or Landlord shall, within thirty (30) days after the actual amount of Additional Rent is known or submitted, pay to the other the amount of any deficiency or overpayment, whichever the case may be.

(d)    Tenant's Proportionate Share of the Real Estate Taxes and the Common Area Expenses due hereunder shall be payable, in advance, in equal monthly installments, subject to change from time to time by Landlord based upon Landlord's estimates of the actual amounts thereof to be due under §§2.02 and 2.03 hereof and subject to adjustment each year within thirty (30) days after Landlord notifies Tenant of the actual amounts due under those Sections.

(e)    Landlord shall give Tenant an itemized statement (the "Statement") showing in reasonable detail the actual Common Area Expenses and Real Estate Taxes for the Year; the amount of Tenant's Proportionate Share of the Common Area Expenses and the Real Estate Taxes; the amount paid by Tenant during the Year; and the amount Tenant owes or the amount Landlord owes as a refund.  Landlord shall use good faith efforts to issue the Statement as soon as reasonably practical after the Year ends, but in all events Landlord shall issue the statement within one hundred twenty (120) days after the year ends.  If Tenant has any questions about the Statement, Tenant or its agent may, within one hundred twenty (120) days of receipt of the Statement, request to review the backup for the statement at the offices of the management agent during regular business hours. If the Statement shows that the actual amount Tenant owes for the Year is less than the estimated pro rata share paid by Tenant, Landlord shall return the difference within a reasonable time.  If the Statement shows that the actual amount Tenant owes is more than the estimated pro rata share paid by Tenant, Tenant shall pay the difference within thirty (30) days after Landlord notifies Tenant. Tenant's failure to make timely payment shall entitle Landlord to the same remedies it has upon Tenant's failure to pay Rent.

(f)    Any dispute with respect to Landlord's determination of Tenant's Proportionate Share of Common Area Expenses or Real Estate Taxes shall be resolved by the parties through consultation in good faith within sixty (60) days after notice by Tenant to Landlord.

However, if the dispute cannot be resolved within such period, the parties shall, by written notice to the other given within ten (10) days after the end of said 60-day period, request an audit of the disputed matter from an independent, certified public accountant selected by both Landlord and Tenant (but not paid on a contingency fee basis), whose decision shall be final and binding on the parties. If there is a variance of five percent (5%) or more in Tenant's favor between said decision and Landlord's determination of Tenant's Proportionate Share of Common Area Expenses or Real Estate Taxes, Landlord shall pay the costs of said audit (up to a maximum amount of $3,500 per audit) and shall credit any overpayment toward the next Minimum Rent and/or Additional Rent payment falling due or pay such overpayment to Tenant within thirty (30) days. If the variance is less than five percent (5%), Tenant shall pay the cost of said audit. Also, if as a result of the audit that Tenant has underpaid Additional Rent, then Tenant shall pay any underpayment to Landlord within thirty (30) days.

§2.06    Proration. All items of Rent shall be prorated for any month during the Term which is not a full calendar month or in which two different rental rates are applicable. If only part of any calendar year falls within the Term, the amount computed as Additional Rent for such calendar year under the foregoing provisions of this Article shall be appropriately prorated, but the expiration of the Term before the end of a calendar year shall not limit Tenant's obligation hereunder to pay the prorated portion of Additional Rent applicable to that portion of such calendar year falling within the Term.

§2.07    Late Penalties. Each payment of Rent shall be made promptly when due (without any demand, deduction, recoupment, counterclaim or setoff whatsoever except as expressly set forth herein), in legal currency of the United States, and at the place directed by Landlord. Any installment of rent or any other charge or money obligation herein required to be paid by Tenant which is not received by Landlord by 5:00 p.m. within five (5) days of when due, shall bear interest at the lesser of (a) the rate of the prime rate published in the *Wall Street Journal* from time to time (or its successor publication) plus four percent (4%) per annum or (b) the maximum interest rate allowed by law, whichever is less (the "Default Rate"), from the due date until paid and the Landlord may treat any such charge or money obligation as Additional Rent hereunder, and payment of such late charge on demand shall be a condition precedent to the curing of any such failure to timely pay Rent by Tenant. Any payment of Rent not paid when due shall be subject to a late payment charge of five percent (5%) of the amount due and payable with the next succeeding Rent payment, provided that Landlord shall allow a grace period of five (5) days for the first late payment in any Year prior to charging said late payment charge. If Landlord does not bill Tenant for such interest or such late payment charges at the time of their respective accruals, such fact will not constitute Landlord's waiver of its right to accumulate such interest and charges and to invoice Tenant on a periodic basis, nor will Landlord's acceptance of any payment from, or by Landlord's furnishing services to, a party other than Tenant constitute Landlord's waiver of its right to such interest and charges or to any other amount owed or that becomes payable to it hereunder. In addition, Tenant shall pay to Landlord as Additional Rent $25.00 for each check presented to Landlord in payment of any obligation hereunder that is not paid when first presented to the bank upon which such check is drawn. If Tenant is late in paying any installment of rent(s) more often than two (2) times in any Year, Landlord shall have the right to require Tenant to make further payments by wire transfer or cashier's check.

§2.08    Sales Reports. Tenant shall submit to Landlord, on or before the twentieth (20th) day following the end of each calendar year that occurs in whole or in part during the Term hereof [including the twentieth (20th) day of the month following the end of the Term], a written statement signed by Tenant, certified by it to be true and complete, and showing the amount of Gross Receipts for that preceding calendar year. The term "Gross Receipts" means all receipts

7

and revenues from all business conducted at, upon or from the Premises by Tenant, subtenants, assignees or others (whether such Gross Receipts are evidenced by cash, check, credit, electronic debit, charge account, exchange or otherwise). Such Gross Receipts include, but are not limited to, amounts received from the sale of merchandise, for services performed, from vending or other machines (excluding amounts paid by Tenant to the owner of such machines), from the sale of lottery tickets, if applicable, and from orders for merchandise or services taken at the Premises (whether such orders are filled from the Premises or elsewhere). Landlord and Tenant acknowledge and agree that Tenant is not required to pay percentage rent to Landlord on its Gross Receipts pursuant to this Lease.

§2.09    **Financial Statements.**  If requested by Landlord, or before the expiration of 120 days after the end of each calendar year (or part year) during the Term, Tenant shall deliver to Landlord (a) an income statement and statement of changes in financial position, both with respect to such calendar year then ending, for Tenant and each guarantor of this Lease, and (b) a balance sheet as of December 31 of such calendar year for Tenant and each guarantor of this Lease. All such financial statements shall be in form and substance, and contain such detail, as is satisfactory to Landlord in its reasonable discretion. Furthermore, such financial statements shall be prepared in accordance with generally accepted accounting principles applied on a consistent basis.

## ARTICLE III - USE OF PREMISES

§3.01    **Use and Operations.**  Tenant shall use and occupy the Premises only for the Permitted Use and only under the Trade Name of Tenant. Tenant may not use the Premises for any other purpose or under any other trade name, however, Tenant may change its Trade Name to any other trade name as Tenant shall then be using at its locations in the Virginia/Maryland/Washington D.C. metro area, upon written notice to Landlord. Tenant agrees to open for business in the Premises as a fully stocked and staffed typical "Not Your Average Joe's" restaurant for one (1) day for the Minimum Hours (the "Required Operating Period") within three hundred sixty five (365) days after Delivery Date. If after the Required Operating Period, Tenant elects to open and operate at the Premises during the balance of the Term, then Tenant shall operate such business as a high-quality establishment and shall be open for business to the public, and fully staffed, in such manner and at such hours as Tenant considers proper in Tenant's reasonable business judgment, provided that for such time that Tenant operates its business within the Premises, it shall operate for the Minimum Hours. Tenant shall not hold or advertise any going out of business, bankruptcy, going discount of fire sale at the Premises, without Landlord's prior written approval. All receiving and delivery of goods and merchandise at or to the Premises, and all removal of merchandise, supplies, equipment, trash and garbage from the Premises, shall be made at the rear of the Premises and during any special hours reasonably established by Landlord. Tenant shall not allow any odors or noise to emanate from the Premises, nor shall Tenant permit any conduct therein which violates the terms of this Lease or the rules and regulations reasonably established by Landlord for the Shopping Center pursuant to Article XI hereof.

§3.02    **Compliance with Laws and Matters of Title.**  Tenant shall comply with any and all laws and regulations, including but not limited to zoning laws and the ADA, applicable to the Premises, to Tenant's use of the Premises, or to Tenant's use of the Common Areas. Provided Landlord performs Landlord's Work set forth in Exhibit E hereto, Tenant shall make any and all alterations or improvements to the Premises required thereby, subject to §3.04 hereof. Tenant shall hire, supervise and manage all persons appropriate or necessary for the operation of Tenant's business, which persons shall all be employees of Tenant and not Landlord; and Tenant shall pay all

8

taxes and other amounts, and carry all workers' compensation insurance, with respect to such employees as is required by law.

§3.03   Insurance - Compliance and Rate.   Tenant shall, at its own cost and expense, comply with all requirements of Tenant's insurance carrier and with all of the orders, rules and regulations of the applicable insurance rating organization(s) having jurisdiction and any similar bodies.  Tenant shall not do or permit to be done any act or thing upon the Premises that would invalidate any fire insurance or other policy or coverage referred to in this Lease.  If, as a result of any failure by Tenant to comply with the terms of the foregoing sentences of this Section, any act or omission of Tenant, its employees, agents, contractors, invitees, or licensees, or the use to which the Premises are put, the fire, extended coverage, or other insurance rate(s) applicable to the Premises or any other portion of the Shopping Center shall be higher than would otherwise be applicable, then, in addition to all other remedies Landlord has under the terms of this Lease, Tenant shall pay to Landlord, on demand and as Additional Rent, such portion of the premiums as shall be attributable to such higher rate(s).  Landlord hereby agrees that use of the Premises for the Permitted Use will not require any additional insurance premiums.  If Tenant installs any electrical equipment that overloads any line in the Premises or the Building, Tenant shall, at its own cost and expense, promptly make whatever changes are necessary to remedy such condition and to comply with all requirements of the Landlord and the Board of Fire Insurance Underwriters, any similar body, and any governmental authority having jurisdiction thereof.  For the purposes of this Section, any finding or schedule of the applicable insurance rating organization having jurisdiction shall be conclusive.

§3.04   Business Methods.   Tenant shall not engage in any unfair method of competition or unfair or deceptive act or trade practice of the type prohibited by applicable consumer protection laws or regulations of the jurisdiction in which the Shopping Center is located.

§3.05   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Rules and Regulations (as defined in Article XII).  Without limiting the foregoing, Tenant▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮  A(d)▮▮▮▮▮ D▮▮▮▮▮▮ shall have the right to rearrange, improve, relocate, repair
or replace the Common Area.  Landlord shall also have the right to temporarily close portions of
the Common Area, or to restrict access thereto, (a) to the extent necessary (4) in the opinion of
Landlord's counsel, to prevent a dedication thereof or the accrual of any rights of any person or the
public therein; (b) to discourage any unlawful by persons or vehicles who or which are not customers
or employees of the Shopping Center; (c) to make repairs, or (d) to make alterations or additional
improvements to the Shopping Center, provided that Tenant is not deprived reasonable access to the
Premises (except on a temporary basis, not to exceed 24 hours).

Landlord may, from time to time, do any one or more of the following with respect to buildings,
or the Common Areas then existing in the Shopping Center or buildings or the Common Areas to
be designated in the Shopping Center:  (i) construct alterations therein; (ii) construct additions
thereto; (iii) construct additional stories thereto; (iv) construct additional buildings, free-standing
or connected to the then-existing buildings; (v) construct deck or elevated parking facilities;

freestanding or connected to then-existing buildings; or (vi) rearrange, relocate, build upon or eliminate any Common Areas, provided that in no event shall there be provided less than the minimum required parking facilities pursuant to local regulations.

§3.06    Promotion of the Shopping Center. Intentionally deleted.

§3.07    Relocation/Recapture.   Notwithstanding anything to the contrary contained in this Lease, beginning on the date which is sixty (60) months following the Rent Commencement Date, in the event that Landlord elects to substantially redevelop the Shopping Center, Landlord shall have the right to require that Tenant relocate from the Premises to a location in the Shopping Center designated by Landlord ("Relocated Premises") which shall contain approximately the same number of square feet as currently contained within the Premises (i. e. not more than 10% larger or smaller than the Premises) and in an equal or better location within the Shopping Center, as reasonably determined by Tenant, such relocation to be implemented in accordance with the terms and conditions set forth below.  Landlord shall advise Tenant in writing as to the location of the Relocated Premises and the date on which the Relocated Premises will be available for Tenant to perform the leasehold improvements necessary to prepare the Relocated Premises for Tenant's use.

If Tenant accepts the proposed Relocated Premises, then:

(a)    Tenant may remain in the original Premises under the terms of this Lease until, and this Lease shall be amended as of the earlier of (i) Tenant's opening for business in the Relocated Premises, or (ii) the one hundred fiftieth (150th) day after Landlord delivers possession of the Relocated Premises in the condition specified on Exhibit E attached hereto, as extended for any Force Majeure Event or a Landlord delay and receipt of all required permits therefor (the effective date of the amendment shall be the "New Commencement Date"), by substituting the Relocated Premises for the original Premises, and Minimum Rent and all Additional Rent due under this Lease shall be proportionately adjusted on a per square foot basis effective as of the New Commencement Date.

(b)    Tenant shall cause all construction in the Relocated Premises to be completed at its own cost and expense and shall open for business no later than the one hundred fiftieth (150th) day following delivery of possession of the Relocated Premises to Tenant and receipt of all required permits therefor. The provisions of this Lease with respect to Landlord's approval of Tenant's plans and specifications for the Space Improvements shall be applicable to the improvements to be made in the Relocated Premises, provided that Tenant shall submit a proposed budget and timeline for completion of the Space Improvements together with its plans and specifications for Landlord's review and approval, which shall not be unreasonably withheld, delayed or conditioned. Tenant shall vacate and surrender the original Premises to Landlord within two (2) business days following the New Commencement Date.  In no event shall Tenant be obligated to cease operating its business in the original Premises in connection with a relocation under this Section 3.07 prior to the New Commencement Date. Each party hereto shall enter into an amendment to this Lease reasonably necessary to effectuate and confirm such relocation.

(c)    Landlord shall reimburse Tenant for the reasonable cost paid by Tenant in constructing Tenant's leasehold improvements in the Relocated Premises (which improvements shall be comparable in quality to the Space Improvements in the original Premises) within thirty (30) days following the later of (i) receipt of a reasonably detailed invoice from Tenant therefor; and (ii) the date that Tenant shall have vacated and surrendered the original Premises in accordance with all provisions of this Lease.  Tenant shall furnish to Landlord such backup information with

respect to its improvements in the Relocated Premises as Landlord reasonably may require.

(d)    In addition to the amounts set forth in subparagraph (c) above, Landlord shall reimburse Tenant for Tenant's reasonable expenses in moving within the Shopping Center within thirty (30) days following receipt of a reasonably detailed invoice from Tenant therefor. Tenant shall furnish Landlord such backup information with respect to such moving costs as Landlord may reasonably require.

(e)    Landlord's exercise of its rights as permitted by this Section shall not (i) constitute a constructive eviction, an interference with Tenant's right of quiet enjoyment, or a disturbance of Tenant's right to use the Premises; and (ii) subject Landlord to damages, including, but not limited to, damages for loss of goodwill, business, or profits. Time is of the essence with respect to Tenant's obligations under this Section.

(f)    If the Premises are relocated under the provisions of this Section, then Landlord shall have no further right to terminate the Lease or relocate the Premises.

In the event that Tenant determines that the Relocated Premises are not acceptable, Tenant shall notify Landlord within ten (10) days after receiving Landlord's relocation notice, and Landlord shall have the right to recapture the Premises and terminate the Lease upon no less than sixty (60) days prior written notice to the Tenant. In the event that Landlord terminates the Lease pursuant to this Section, then the Lease shall terminate on the date set forth in Landlord's termination notice and Tenant shall surrender the Premises pursuant to the terms and conditions set forth in this Lease; provided however, Landlord shall reimburse Tenant in an amount equal to the unamortized value of the Space Improvements less the unamortized value of the Improvement Allowance actually received by Tenant, such amortization to be calculated on a straight line basis over a period of fifteen (15) years, such reimbursement to be made within thirty (30) days following receipt of written demand from Tenant therefor.

§3.08.    Radius Restriction.  Intentionally deleted.

§3.09.    Limitations of the Premises.  Tenant may not impair any structural element of the Premises, and may not use or impair the roof of the Premises, the foundation of the Premises, the land beneath the Premises, or the exterior surface of any exterior wall of the Premises (said structural elements, roof, etc., being hereinafter referred to, collectively, as the "Structural Elements"). Landlord reserves the Structural Elements and the right to install, maintain, use, repair and replace pipes, ducts, conduits, wires and structural supports in a commercially reasonable manner in the Premises to serve the Premises and/or other parts of the Shopping Center.

§3.10.    Exclusive Use.  Subject to the rights of existing tenants, as well as subsequent renewals and replacements for a similar use, as set forth on Exhibit D, and provided that Tenant has not been in default of its obligations under this Lease beyond any applicable notice of cure periods and is open and operating within the Premises pursuant to its Permitted Use, then during the Term, Landlord shall not lease any premises in the Shopping Center to any tenant whose primary use is for the purpose of operating a casual themed, full-service restaurant containing 3,500 rentable square feet or more, with an average per person check charge of $16 to $22 (increased on an annual basis based upon a percentage which is equal to the annual increase in the Consumer Price Index for All Urban Consumers Price Index for All Urban Consumers (CPI U), all items for the Baltimore, Maryland selected local area (Base: 1983-84=100) as published by the U.S. Department of Labor, Bureau of Labor Statistics (the "CPI Adjustment") and with a menu comparable to Not Your Average Joe's, including Bertucci's, Burton's, Café Deluxe, California Pizza Kitchen, Cheesecake

11

Factory, Houston's, J. Alexander's, Pizzeria Uno, Clyde's Restaurant Group, and Great American Restaurant. The foregoing is referred to herein as "Tenant's Exclusive." Notwithstanding anything to the contrary, Tenant's Exclusive shall not apply to: (1) any restaurant that occupies less than 3,500 square feet in the Shopping Center; (2) any self-service restaurant or any quick, casual or fast food restaurant; (3) any fine dining restaurant (which shall be considered a restaurant with an average per person check of $50.00 or more (excluding any tip); (4) any restaurant whose primary use is a steak or chop house (including, but not limited to, Outback Steakhouse and Longhorn Steakhouse); (5) any restaurant whose primary use involves the sale of seafood (including, not limited to, Red Lobster and Bonefish Grill); (6) any delicatessen; (7) any restaurant with at least 75% of its menu items featuring ethnic foods such as Mexican, Asian, Cuban, Ethiopian, Greek, Indian, French, Italian (provided no more than 20% of its menu items are pizza items) and South American cuisine, or (8) the premises occupied by Chick-fil-A (Unit 309) and Panera (Unit 285) as of the date of this Lease. During any period of violation of Tenant's Exclusive (the "Exclusivity Failure"), Tenant may immediately pay fifty percent (50%) of Minimum Rent ("Alternate Rent") in lieu of Minimum Rent and all Additional Rent due hereunder, provided however that Tenant shall not pay Alternate Rent for a period in excess of twelve (12) consecutive months (the "Exclusivity Alternate Rent Period"). At the end of the Exclusivity Alternate Rent Period, Tenant shall have the option to either (a) terminate the Lease, by providing to Landlord written notice of such termination, to be effective ninety (90) days after the giving of Tenant's notice, during which Tenant shall continue to pay Alternate Rent, or (b) revert back to paying all applicable Rent under the Lease.

Tenant agrees to notify Landlord of any alleged, demonstrable infraction of Tenant's Exclusive and to permit Landlord a reasonable opportunity to cure any such violation. Tenant shall not be entitled to any monetary or pecuniary damages against Landlord (but shall be entitled to the abatement of Rent specified in the preceding paragraph) so long as Landlord (i) shall comply with this Section 3.10 by restricting future tenant leases in the Shopping Center and enforcing its rights under its leases with the existing tenants, and (ii) shall not affirmatively authorize the violation of Tenant's Exclusive, but Landlord agrees that Tenant may seek injunctive and other equitable relief as it deems necessary to enforce the terms of this Lease.

§3.11 Tenant's Go Dark Right. If Tenant shall elect to cease to operate its business in the Premises after the Required Operating Period permanently (and not temporarily for Permitted Closures), Tenant shall give Landlord at least sixty (60) days prior written notice of such intent. Landlord shall have the right, at any time following the expiration of said 60-day period, for as long as Tenant's cessation to operate is still in effect, to terminate this Lease and to recapture the Premises and the Patio Space by giving Tenant thirty (30) days' written notice of such intention, and this Lease shall terminate effective as of the day following the last day of such 30-day period ("Recapture Effective Date"), unless Tenant has sought Landlord's approval to re-open and has been granted Landlord's approval (such approval to be granted or withheld in Landlord's sole discretion) and Tenant has reopened the Premises for business during such 30-day period, in which case, Landlord's termination right under this Section 3.11 shall be null and void unless Tenant exercises its rights hereunder again, in which event Landlord shall have a recapture right pursuant to the terms set forth herein. Upon the Recapture Effective Date, Tenant shall surrender to Landlord the Premises in their then "AS IS" condition but with all of Tenant's furniture, removeable trade fixtures and equipment installed therein removed (and any damage caused by such removal repaired). Tenant shall pay all Rent due under this Lease and perform all of its obligations hereunder up to the Recapture Effective Date, whereupon this Lease shall terminate and neither party shall have any obligation to the other except for obligations which by their express terms survive termination of this Lease. For the purpose of this Section 3.11, Tenant shall not be deemed to have ceased operating its business in the Premises if Tenant is closed temporarily for remodeling, inventory or in connection with a Permitted Transfer (up to a maximum of thirty (30) consecutive

12

days), provided that Tenant shall provide at least thirty (30) days' prior written notice to Landlord prior to ceasing operations for any of the foregoing reasons, or if closed due to any fire or casualty or interruption of utility services, or if Tenant is closed due to a Force Majeure Event (as defined below) or while a violation of Tenant's Exclusive remains uncured (collectively, "Permitted Closures"). If Tenant elects to cease operating at the Premises after the Required Operating Period and Landlord has not exercised its recapture right set forth in this Section 3.11, Tenant shall nonetheless remain liable for all of its lease obligations, including the payment of Minimum Rent and Additional Rent.

§3.12    Measurement of Space. Landlord or Tenant shall have the right to remeasure the Premises (from the outside of the exterior walls) within sixty (60) days after the Delivery Date and shall provide the opportunity for a representative of the non-measuring party to be present during said remeasurement. If any measurement of the Premises (taken from the outside of exterior walls and the middle of demising walls), as determined by the measuring party's architect, reveals that the actual rentable square footage of the Premises is more than two percent (2%) different than that set forth in the Reference Pages of this Lease, then (a) the rentable square foot number set forth in the Reference Pages shall be automatically adjusted to reflect the actual rentable square footage, as so determined; (b) the Minimum Rent shall be adjusted for each Year, at the per square foot rate applicable to the Year, to reflect that actual rentable square footage; and (c) the Improvement Allowance and Tenant's Proportionate Share of Real Estate Taxes and Common Area Expenses shall be adjusted to reflect that actual rentable square footage. Landlord and Tenant shall also, within that sixty (60) day period, enter into a written amendment to this Lease setting forth all such changes.

## ARTICLE IV - INSURANCE / INDEMNIFICATION

§4.01    Tenant's Insurance.    Tenant shall procure and maintain, at its expense and throughout the Term, the following insurance policies:

(a)    Commercial general liability insurance policy against claims for bodily injury, personal injury, advertising injury and property damage arising from the Premises, or the use of any portion of the Shopping Center by Tenant or its agents, employees, contractors, invitees and licensees, and having limits of not less than one million dollars ($1,000,000) per occurrence; two million dollars ($2,000,000) for the general aggregate (per location), two million dollars ($2,000,000) for the products and completed operations aggregate, two million dollars ($2,000,000) for personal and advertising injury liability, fifty thousand dollars ($50,000) for fire damage liability, and five thousand dollars ($5,000) for medical payments, which minimum limits may be increased from time to time if required by Landlord's insurance professionals;

(b)    Business liability insurance policy for ownership, use or maintenance of any automobile, with a combined single limit of not less than one million dollars ($1,000,000);

(c)    Employer's liability insurance policy with limits of not less than five hundred thousand dollars ($500,000) for each accident and five hundred thousand dollars ($500,000) for each employee for bodily injury by disease;

(d)    Worker's compensation insurance policy as required by law;

(e)    Umbrella excess liability insurance policy in addition to and in excess of the commercial general liability, business automobile liability and employer's liability insurance

13

policies described above, against claims for bodily injury, personal injury, advertising injury and property damage and having limits of not less than five million dollars ($5,000,000) per occurrence and five million dollars ($5,000,000) for the annual aggregate; and

(f)     All-risk property insurance policy covering all personal property, inventory, plate glass, equipment, fixtures, alterations and improvements at the Premises up to the replacement value of such property.

(g)     Contractual liability insurance covering Tenant's indemnities hereunder.

(h)     Intentionally deleted.

(i)     If Tenant or any occupant of the Premises sells alcohol for on-premises consumption, dram shop or liquor liability insurance with limits of not less that $1,000,000 per occurrence, insuring against Tenant's and/or Landlord's vicarious liability with respect to the actions of Tenant's patrons on or off the Premises which may arise by reason of Tenant's sale of alcoholic beverages to patrons.

Each liability insurance policy described above shall name Landlord, LaSalle Investment Management, Inc. (Landlord's agent and advisor), Landlord's property manager (as identified in writing to Tenant), and any and all Mortgagees as additional insureds. Landlord shall have no interest in any insurance proceeds Tenant receives for Tenant's property pursuant to the policy specified in Section 4.01(f) above and Landlord shall sign all documents which are necessary or appropriate in connection with the settlement of any claim or loss by Tenant. Tenant's policies shall not be contributing with or in excess of any coverage which Landlord shall carry on the Shopping Center. All such policies shall (a) be issued by insurers licensed to do business in the state in which the Property is located; (b) be issued by insurers with a current rating of "A-VII" or better in Best's Insurance Reports; (c) be primary without right of contribution from Landlord's insurance policies (if any); (d) with respect to liability insurance, not contain any pollution exclusion denying coverage for damage or injury by heat, smoke or fumes by hostile fire; (e) be written on an occurrence (and not claims-made) basis; (f) be uncancellable without at least thirty (30) days prior written notice to Landlord and all Mortgagees; (g) not except coverage with respect to Landlord in the event that Tenant is found to have been grossly negligent. Before the Commencement Date (or, if earlier, before Tenant enters the Premises to perform any work), Tenant shall deliver to Landlord a copy or certificate of each such policy required above. At least thirty (30) days before any such policy expires, Tenant shall deliver to Landlord a certificate of renewal or replacement of the policy. Tenant shall be responsible for payment of any deductibles required by such insurance policies. In the event that Tenant fails to provide evidence of insurance required to be provided by Tenant hereunder during the Term, within ten (10) days following Landlord's request thereof, and thirty (30) days prior to the expiration date of any such coverage, Landlord shall be authorized (but not required) to procure such coverage in the amount stated with all costs thereof to be chargeable to Tenant and payable upon written invoice therefor. The limits of insurance required by this Lease, or as carried by Tenant, shall not limit the liability of Tenant or relieve Tenant of any obligation hereunder, except to the extent provided for with respect to the waiver of subrogation in §4.03 hereof.

§4.02     Landlord's Insurance.     Landlord shall obtain or maintain all-risk property insurance (with commercially reasonable deductibles) upon the Shopping Center (including all permanent improvements made to the Premises), boiler and machinery insurance (if appropriate), and commercial general liability insurance in such amounts as are normally carried by Landlord for similar properties in the Washington, D.C. Metropolitan area. Landlord's liability insurance shall

14

include without limitation contractual liability covering Landlord's obligations under Section 4.05 and with an each occurrence limit of not less than Two Million Dollars ($2,000,000) and a general aggregate limit of not less than Five Million Dollars ($5,000,000). Landlord's Insurance shall be primary with respect to any claim arising out of events that occur in the Common Areas. The premiums for such insurance shall be Common Area Expenses.

§4.03   Waiver of Subrogation. Neither Landlord nor Tenant shall be liable to the other for loss or injury to the extent the damages therefor (a) are actually paid under an insurance policy actually obtained hereunder by the damaged party; or (b) are or would be covered under an insurance policy any party is required to obtain hereunder provided that a claim were properly made under such policy. The foregoing shall apply whether such loss or injury is caused by the negligence or misconduct of the party that is otherwise liable or of its contractors, agents, employees, invitees or licensees. Each party further agrees that it will cause the policies of insurance it obtains hereunder to contain a clause providing that the insurance shall not be invalidated should the insured waive, in writing prior to a loss, any or all right of recovery against any person or entity for loss covered by such insurance.

§4.04   Tenant Indemnification. Unless caused by the negligence or willful misconduct of Landlord, its agents, employees or contractors and subject to Section 4.03, Tenant shall defend, indemnify and hold harmless Landlord (and Landlord's officers, directors, shareholders, members, partners, employees and agents, Mortgagees, and any master lessor of all or part of the Shopping Center) from and against any and all claims, demands, actions, suits, judgments, damages, losses, liability, costs and expenses (including, but not limited to reasonable attorneys' fees) to the extent that they arise, directly or indirectly, in connection with (a) any injury to person or property, loss of life, or other act or omission that occurs on the Premises at any time between the date Landlord delivers possession thereof to Tenant and the expiration or earlier termination of this Lease; or (b) any act or omission of Tenant or Tenant's agents, employees, contractors, licensees upon the Premises or the Shopping Center. Tenant's liability hereunder covers any and all reasonable attorneys' fees Landlord, or any of the parties indemnified hereunder, may incur in hiring separate counsel, or in intervening in any litigation, to protect its, his or her interest in such manner as it, he or she deems appropriate. The liability of Tenant to indemnify Landlord shall not extend to any matter against which Landlord shall be effectively protected by the net proceeds collected by Landlord (after payment of all reasonable attorneys' fees and other costs of collection) under an insurance policy actually obtained hereunder; however, if any such liability exceeds the amount of such proceeds, then said liability of Tenant shall apply to such excess. Without limiting the foregoing, if a lien is filed against any portion of the Shopping Center by reason of any of the matters covered by the foregoing indemnity, then Tenant shall, within thirty (30) days after such filing, discharge the same by payment, bonding or otherwise.

§4.05   Landlord Indemnification. Unless caused by the negligence or willful misconduct of Tenant, its agents, employees or contractors and subject to Section 4.03, Landlord shall defend, indemnify and hold harmless Tenant (and Tenant's officers, directors, shareholders, members, partners, employees and agents) from and against any and all claims, demands, actions, suits, judgments, damages, losses, liability, costs and expenses (including, but not limited to reasonable attorneys' fees) to the extent that they arise, directly or indirectly, in connection with (a) any injury to person or property, loss of life, or other act or omission that occurs in the Common Areas at any time during the term of this Lease; or (b) any negligent or willful act or omission of Landlord or Landlord's agents, employees, contractors, licensees upon the Premises or the Shopping Center. Landlord's liability hereunder covers any and all reasonable attorneys' fees Tenant, or any of the parties indemnified hereunder, may incur in hiring separate counsel, or in intervening in any litigation, to protect its, his or her interest in such manner as it, he or she deems appropriate.

15

## ARTICLE V – IMPROVEMENTS TO PREMISES

### §5.01   Initial Improvements.

(a)   Landlord shall use good faith commercially reasonable efforts to deliver the Premises and the Patio Space to Tenant "broom clean," vacant and ready for Tenant's occupancy with Landlord's Work specified in Exhibit E hereto complete on or before August 1, 2011 ("Target Delivery Date").

(b)   Certain improvements shall be constructed in the Premises (collectively, the "Space Improvements") for the purpose of initially preparing the Premises for occupancy by Tenant and shall be paid for as provided in subparagraph (b) of this Section. Such Space Improvements shall be constructed by Tenant in accordance with the following procedures:

(1)   Plans and specifications for the Space Improvements to the Premises (including any changes to the façade) ("Tenant's Plans") shall be submitted to Landlord within ninety (90) days after the date of this Lease. Notwithstanding the foregoing, Tenant shall submit a conceptual storefront elevation drawing and its proposed changes to the Patio Space to Landlord within thirty (30) days after the date of this Lease. Landlord shall review Tenant's Plans, and either approve them or notify Tenant of proposed changes thereto, within ten (10) days after receiving them. Landlord's approval shall not be unreasonably withheld, conditioned or delayed. Tenant shall, within ten (10) days in each instance, make any changes to such Tenant's Plans reasonably requested by Landlord. Landlord agrees that Tenant's Plans may include changes to the exterior façade of the Building to give Tenant its own brand identity from the rest of the tenants in the Shopping Center and shall not reject any Tenant's Plans based upon such façade changes. Landlord shall cooperate with Tenant in connection with any façade change reasonably requested by Tenant, at Tenant's sole cost and expense, provided that any permits or approvals required in connection with the foregoing shall not be subject to the terms of Section 1.02 herein.

(2)   Promptly after Tenant's Plans have been finalized, Tenant shall, if necessary, solicit bids and/or negotiate with contractors for construction of the Space Improvements and enter into written contracts with a contractor or contractors for the construction of such improvements and with other professionals for appropriate services in connection therewith. The contractor(s) and professional(s) so engaged by Tenant shall be subject to Landlord's prior written approval, which shall not be unreasonably withheld, conditioned or delayed. All such construction shall be done at Tenant's risk in accordance with the approved plans and specifications and all applicable laws and regulations. Prior to commencing construction, Tenant shall, at its sole cost and expense, promptly apply for and proceed with diligence to obtain all Government Approvals and shall commence construction of the Space Improvements within ten (10) days following its receipt of said Government Approvals; and, promptly after completion of such work, Tenant shall procure a certificate of occupancy for the Premises from the applicable governmental authorities and provide a copy thereof to Landlord. All such construction shall be overseen by Landlord through its construction manager. Tenant shall permit Landlord and Landlord's construction manager to inspect the Premises and Tenant's work at all times during construction. Subject to §1.01 hereof, Tenant and its agents and contractors shall have the right to enter the Premises prior to the Commencement Date for such construction purposes, provided that, inter alia, prior to any such entry, Tenant shall have obtained the insurance required under Article IV hereof, and its contractors shall have obtained such liability, workers' compensation and other insurance as is reasonably acceptable to Landlord.

16

(c)   Subject to subsection (e) herein, all costs and expenses of designing and constructing the Space Improvements, including but not limited to all fees, costs and expenses paid under construction contracts and subcontracts, the costs and expenses of materials, supplies, permits and other items, and any other out-of-pocket expenditures incurred in any connection with such construction, shall be paid by Tenant.

(d)   Subject to Section 1.07 herein, Tenant shall complete such improvements on or before the Rent Commencement Date, subject to extension for delays caused by a Force Majeure Event (as defined below) and by Landlord.

(e)   Landlord shall pay the Improvement Allowance to Tenant upon Tenant's opening for business in the Premises and within thirty (30) days of Tenant's written confirmation of its completion of the Space Improvements, in accordance with the plans and specifications approved by Landlord in writing, provided that: (i) Landlord shall have received all lien waivers from Tenant's general contractor and all subcontractors who would be legally entitled to file a lien against the Shopping Center and for which the contract amount is greater than or equal to $10,000; and (ii) Tenant shall have submitted invoices and other documentation reasonably acceptable to Landlord evidencing the expenditure of the Improvement Allowance. Landlord and Tenant agree that the Improvement Allowance offsets the costs of the flooring, ceiling, and other work forming a part of the Space Improvements, all of which, upon installation, shall become the property of Landlord and remain in the Premises. Tenant shall not apply the Improvement Allowance to any removable fixtures, furnishings or equipment to be installed in the Premises. If Landlord has not paid Tenant the Improvement Allowance within fifteen (15) days after the date Landlord is required to pay the same pursuant to this subparagraph (e) and such failure continues for ten (10) days following written notice thereof from Tenant, then in addition to any other remedies Tenant has, Tenant may offset the unpaid amount and a One Hundred Dollar ($100.00) per month administrative fee, against Minimum Rent and all Additional Rent (at Tenant's discretion) until the Improvement Allowance is fully recouped.

§5.02    Signs.    Subject to all applicable laws, regulations and rules (including without limitation the requirements promulgated by the City of Gaithersburg, Maryland), Tenant, at its cost, shall have the exclusive right to install or place signs, awnings, or other advertising materials in, on or about the Premises and the Patio Space to the maximum extent permitted by law and allocable to the Premises and not committed to or reserved for other current tenants of the Shopping Center (collectively, "Exterior Signage"), subject to Landlord's approval, which shall not be unreasonably withheld, delayed or conditioned. All Exterior Signage and awnings shall be in compliance with applicable laws. Landlord expressly agrees that, subject to approval by the City of Gaithersburg, Maryland authorities, Tenant shall be permitted to install Tenant's then-current trademarked name(s), colors, letters, font and logo in Tenant's signage and Tenant's standard awnings on exterior windows of the Premises and the Premises' storefront. Landlord shall not allow any signage other than Tenant's to be erected anywhere on the exterior storefront of the Premises or within the Patio Space without Tenant's prior written consent. Any window signs or displays shall be prepared in a professional manner and shall be in accordance with Landlord's Rules and Regulations. Landlord may remove, at Tenant's cost and expense and as Additional Rent, any signs or displays that are not in compliance with the requirements of this Lease. No symbol, design, mark, name, or insignia adopted by Landlord for the Shopping Center shall be used by Tenant without Landlord's prior written consent; provided that Tenant may use any such symbol, design, mark, name or insignia for purposes of referencing the location of the Premises in Tenant's marketing and promotional materials. At the end of the Term or earlier termination of this Lease, Tenant shall remove the Exterior Signage and any other signage installed during the Term hereof and shall repair any damage caused by such removal.

17

§5.03    Condition. Tenant acknowledges that the Premises are leased hereunder "AS-IS, WHERE-IS", without warranty as to condition, suitability for a particular purpose or any other matter whatsoever, provided, however, that Landlord shall deliver the Premises (including the Occupied Space) and the Patio Space to Tenant "broom clean," vacant and ready for Tenant's occupancy and otherwise in the condition described in Exhibit E attached hereto and made a part hereof. All such work by Landlord shall be performed in a good and workmanlike manner, in accordance with all applicable laws and regulations (including but not limited to the ADA), and in accordance with all applicable insurance requirements and the requirements of any Mortgagee. Within thirty (30) days following delivery of possession of the Premises with Landlord's Work completed, Tenant may provide Landlord with a so-called "punch list" of items that do not conform to the requirements of Exhibit E or are otherwise in violation of law, and Landlord shall correct all items on said punch-list within thirty (30) days of receipt of same at Landlord's sole cost and expense.

§5.04    Tenant's Alterations.    Tenant shall not make any alteration, addition or improvement to the Premises, whether structural or nonstructural, without Landlord's prior written consent, which shall not be unreasonably withheld, conditioned or delayed. Tenant may make such non-structural alterations, improvements and additions to the Premises costing One Hundred Thousand and 00/100ths Dollars ($100,000) or less in any one instance, including, without limitation, changing color schemes, installing new countertops, flooring, wall-covering and modifying the layout of the tenant removeable trade fixtures, as Tenant deems necessary or desirable without obtaining Landlord's consent. Notwithstanding the foregoing, Tenant shall not make any alterations, improvements, additions or repairs in, on, or about the Premises which affect the structure or the mechanical systems of the Building or the exterior of the Building without Landlord's prior written consent, which consent may be given or withheld in Landlord's sole discretion. All alterations to the Premises, including any work described in Section 5.01 herein, shall conform to the requirements set forth on Exhibit H, attached hereto and incorporated herein. Tenant shall provide such drawings, plans and specifications as are reasonably requested by Landlord in reviewing any such proposed improvements. If Landlord consents to any such proposed alteration, addition or improvement, it shall be made at Tenant's sole cost and expense and at such time and in such manner as to not unreasonably interfere with the use and enjoyment of the remainder of the Shopping Center by any other tenant or other person. Landlord may, as a condition of granting its consent or approval hereunder, require Tenant to post such payment and performance bonds as Landlord deems reasonable to protect Landlord, any Mortgagee, and the Premises. In making any alteration, addition or improvement to the Premises, Tenant shall use materials equal or exceeding in quality and kind the original construction, as certified by the architect who designed the Shopping Center or by such other architect as is designated by Landlord. All such alterations, additions and improvements shall be performed (a) in a good and workmanlike manner; (b) in accordance with all applicable laws and regulations, including but not limited to the ADA; (c) in accordance with all applicable insurance requirements and requirements of any Mortgagee; and (d) in accordance with the drawings, plans and specifications reasonably approved by Landlord. All work performed by Tenant shall be subject to Landlord's inspection and approval to determine whether it complies with the requirements of this Lease. Prior to the commencement of any such work by Tenant, Tenant shall obtain all necessary endorsements to the insurance required by Article IV hereof to be sure that the same covers the performance of such work. Furthermore, Tenant shall defend, indemnify and hold harmless Landlord from and against any and all damages, losses or liability arising from such alterations or improvements or the construction thereof by Tenant or any contractor acting on behalf of Tenant.

18

§5.05    Mechanics' Liens.  Tenant shall (a) within thirty (30) days following the filing thereof bond or have released any mechanics', materialman's or other lien filed or claimed against any or all of the Premises, the Building, or any other property owned or leased by Landlord by reason of labor or materials provided for Tenant or any of its contractors or subcontractors, or otherwise arising out of Tenant's use or occupancy of the Premises; and (b) defend, indemnify and hold harmless Landlord from and against any and all liability, damage, cost, or expense (including but not limited to attorneys' fees) incurred by Landlord on account of any such lien or claim.

§5.06    Ownership.  Any and all improvements, repairs, alterations, fixtures (except removable trade fixtures, furniture and equipment, unless paid for by Landlord) or other property attached to or otherwise affixed to the Premises by Landlord or Tenant shall become Landlord's property, subject to §1.03 hereof.

## ARTICLE VI - MAINTENANCE

§6.01    Cost and Maintenance by Tenant.    Tenant shall, at its own expense and throughout the Term of this Lease, promptly make all repairs and replacements, and perform all maintenance, in, to or about the Premises, and to the equipment and fixtures therein or appurtenant thereto, that are necessary in order to keep the Premises in good, clean, safe and working order, condition and repair, or that are required by law or governmental authority, or any insurance carrier providing an insurance policy to Landlord or Tenant in connection with the Shopping Center, the Premises or this Lease.  Without limiting the foregoing, Tenant, at its expense, is specifically required to make promptly all repairs (or, if applicable, to notify promptly the respective utility company to make all repairs within its exclusive control) to (a) all pipes, water and waste lines, ducts, wires and conduits beneath or in the Premises or within the ceiling of the Premises which solely serve the Premises; (b) the glass windows and plate glass doors of the Premises; (c) Tenant's sign(s); (d) all electrical, natural gas (if any), plumbing and other systems, equipment, fixtures and other items solely servicing the Premises; and (e) the floors, ceilings and non-structural walls of the Premises.  If §3.01 of this Lease permits Tenant to store or prepare food at the Premises, Tenant shall scrub, wash and clean all equipment, vents and cooking areas in the Premises on a daily basis and according to reasonably high standards of hygiene and cleanliness.  Additionally, in said event, Tenant shall install, maintain and utilize such grease interception equipment as may be necessary in connection with its preparation of food.  All floors of the Premises shall be mopped or vacuumed (as appropriate) on a daily basis, and all garbage and refuse shall be sealed in airtight containers and removed at least once each day to such trash collection containers as are designated by Landlord.  Tenant shall enter into a contract with a contractor reasonably approved by Landlord for the removal of its trash at Tenant's sole cost.  Tenant shall, at its own expense, enter into a service contract with a contractor reasonably approved by Landlord providing for regularly scheduled maintenance and servicing of all heating, ventilation and air conditioning systems and equipment ("HVAC") exclusively serving the Premises, and, if applicable, any equipment (regardless of whether said equipment is located in the Premises or on the exterior) relating to grease interception from the Premises.   Such contract shall include all services suggested by the equipment manufacturer and shall become effective within thirty (30) days after the Rent Commencement Date.  Notwithstanding the foregoing, Landlord may, at its option, maintain the HVAC serving the Premises, together with the HVAC serving other tenant spaces at the Shopping Center, through a combined service contract, in which event the cost of such service contract shall be one of the Common Area Expenses and shared by all of the tenants whose HVAC is serviced in this manner.  Tenant shall notify Landlord promptly of any and all defects and damages Landlord is required to correct or repair under §6.02 hereof.  Notwithstanding any provision to the contrary, Tenant's obligations under this Section 6.1 shall not include making (a) any repair or improvement necessitated by the negligence or willful misconduct of Landlord, its agents, employees or servants;

(b) any repair or improvement caused by Landlord's failure to perform its obligations hereunder or under any other agreement between Landlord and Tenant; (c) any structural or seismic repairs, improvements or alterations to the Premises or the Shopping Center; or (d) any remediation or removal of Hazardous Materials (defined below) not released by Tenant or its agents, employees, or servants (anywhere in the Shopping Center) (within the Premises only). Tenant shall be responsible for remediation or removal of Hazardous Materials released by Tenant or its agents, employees or servants.

§6.02   Maintenance by Landlord.   Except for repairs, maintenance and replacements to the Premises and the Building for which Tenant is responsible under Section 6.1, Landlord shall maintain, repair and make replacements to the Premises, the Building and the Shopping Center (including all Common Areas thereof). Landlord shall, at its sole cost and expense (subject to Tenant's payment obligations, if any, pursuant to Section 2.03 above), make the repairs and replacements and perform such work that is necessary to maintain the Shopping Center in a good condition. Such repairs, replacements and maintenance shall include (without limitation) (a) the upkeep of the roof, roof membrane and roof systems (gutters, downspouts and the like), foundation, exterior walls, interior structural walls, and all structural components of the Building and (b) the maintenance and repair of the parking areas, sidewalks, landscaping and drainage systems for the Shopping Center and all base-building utility systems (including mechanical, electrical, and HVAC systems) and plumbing systems which serve the Shopping Center and/or the Building as a whole and not a particular tenant's premises. Landlord shall not be required to maintain the interior surface of exterior walls, windows, window frames, doors, door frames, or plate glass and store front of the Premises or any part of the Patio Space (except where maintenance of the same is caused by Landlord's negligence or failure to perform its obligations under this Lease). Landlord shall make all repairs under this Section promptly after Landlord learns of the need for such repairs but in any event Landlord shall commence to make such repairs within thirty (30) days after Tenant notifies Landlord in writing of the need for such repairs. All costs and expenses incurred by Landlord under this Section shall be Common Area Expense. However, if such maintenance or repair results from any negligent act of Tenant, its agents, employees, invitees, or contractors, then (a) the costs and expenses thereof shall not be Common Area Expense; and (b) Tenant shall, upon demand, reimburse Landlord as Additional Rent for one hundred ten percent (110%) of such costs and expenses, [such costs to include Landlord's out-of-pocket expenses and the compensation of Landlord's employees, and with the additional ten percent (10%) being intended to compensate Landlord for its overhead in relation thereto].

§6.03   Interruption.   Unless caused by Landlord's negligence or willful misconduct, Landlord shall have no liability to Tenant on account of any failure, modification or interruption of electricity, water or other utility, HVAC or other service, and Tenant shall not be entitled to any abatement or diminution of Rent on account thereof. However, if such interruption occurs, Landlord shall take reasonable steps to provide for the resumption of such service to the extent the same is part of Landlord's responsibility hereunder and within Landlord's control. Notwithstanding the foregoing, if there is an interruption in any utility service to the Premises caused by the negligence or willful misconduct of Landlord or its agents or contractors, which interruption prevents Tenant's use of the Premises or the operation of its business therein and such interruption continues for a period of three (3) consecutive days after Landlord's receipt of written notice from Tenant, then so long as the correction of the problem is within Landlord's reasonable control, Tenant shall be entitled to an abatement of Rent for each day that such utility service is not available commencing after the expiration of the three (3) day period until such utilities are restored. Additionally, if such interruption continues for a period of one hundred twenty (120) consecutive days after Landlord's receipt of written notice from Tenant, then Tenant shall be permitted to terminate the Lease upon written notice to Landlord given within

20

ten (10) days after the expiration of such one hundred twenty (120) day period. Such termination shall be effective within ten (10) days after Landlord's receipt of Tenant's termination notice except that if Landlord restores utilities to the Premises, Tenant's election to terminate the Lease will be null and void and this Lease shall continue unaffected.

§6.04    Utilities. Landlord, at its sole cost and expense, will provide for electricity and other utilities (except water) supplied to or used in connection with the Premises, to be separately metered to the Premises on or before the Delivery Date. Tenant shall be responsible for arranging directly with suppliers to provide, at Tenant's expense, any electricity, gas or other services which are required by Tenant in its operations during the Term. Landlord shall bill Tenant for its water usage, which shall be measured pursuant to a submeter that gauges usage from the Premises. Tenant shall be responsible for payment for all charges for electricity and other utilities supplied to or used in connection with the Premises after the Delivery Date and shall pay such charges directly to the supplier thereof.

## ARTICLE VII - RIGHT OF ENTRY

Landlord and its agents and contractors shall be entitled to enter the Premises at any time (a) to inspect the Premises; (b) to exhibit the Premises to any existing or prospective purchaser, tenant or Mortgagee; (c) to make any alteration, improvement or repair to the Building or the Premises; or (d) for any other purpose relating to the operation or maintenance of the Shopping Center. Landlord shall (a) give Tenant at least twenty-four (24) hours' prior notice of its intention to enter the Premises (unless doing so is impractical or unreasonable because of emergency), and (b) use commercially reasonable efforts to minimize any interference with Tenant's use and enjoyment thereof. In the event of substantial, material or unreasonable interference as a direct result of Landlord's activities, the Minimum Rent and Additional Rent due hereunder shall be fully abated if the interference continues for more than three (3) days after Landlord's receipt of written notice thereof.

## ARTICLE VIII - CASUALTIES

§8.01    General. If the Premises are damaged by fire or other casualty during the Term, then the following shall apply:

(a)    Landlord shall restore the Premises with reasonable promptness, taking into account the time required by Landlord to effect a settlement with, and to procure any insurance proceeds from, any insurer against such casualty, to substantially the same condition as existed immediately before such casualty. Landlord may temporarily enter and possess any or all of the Premises for such purpose. Landlord shall not be obligated to repair or restore any fixture, improvement, alteration, furniture or other property owned or installed by Tenant, except alterations or improvements for which insurance proceeds are specifically made available under policies obtained hereunder.

(b)    The times for commencement and completion of any such restoration shall be extended for the period of any delay due to a Force Majeure Event. If Landlord does not undertake to restore the Premises within sixty (60) days from the date of the casualty, or Landlord undertakes to restore the Premises and such restoration is not substantially completed within one hundred eighty (180) days plus the period of any extension for a Force Majeure Event as aforesaid, then Tenant may terminate this Lease by giving written notice thereof to Landlord within thirty (30) days thereafter.

21

(c)     From the time of such fire or other casualty to completion of the restoration, all of Tenant's rental obligations shall be abated proportionately for that portion of the Premises which is rendered untenantable as a result of the casualty.

§8.02    Substantial Destruction. Notwithstanding §8.01 hereof, the following shall apply:

(a)     Landlord may terminate this Lease, by giving written notice thereof to Tenant within sixty (60) days after the fire or other casualty, if the Building is so damaged thereby that (1) the Building is rendered substantially unfit for occupancy and cannot be reasonably be restored within 180 days, as reasonably determined by Landlord, (2) the Building is damaged to the extent that Landlord elects to demolish the Building, or (3) any Mortgagee requires that any or all of the insurance proceeds issued on account of such damage be used to retire all of the debt secured by its Mortgage.

(b)     If any damage or destruction occurs to the Premises or the Patio Space during the last two (2) years of the Initial Term or any Extension Period and the cost to repair the damage exceeds One Hundred Thousand Dollars ($100,000.00), then Tenant may terminate this Lease upon giving Landlord thirty (30) days written notice.

(b)     If this Lease is terminated by either party pursuant to Section 8.01 or 8.02, then (1) Tenant shall pay to Landlord the Minimum Rent and any Additional Rent payable by Tenant hereunder through the date of the fire or other casualty, (2) Landlord shall repay to Tenant any and all prepaid Rent for periods after such fire or other casualty, and (3) Landlord may enter upon and repossess the Premises without further notice.

§8.03    Tenant's Negligence. Also notwithstanding §8.01 hereof, but subject to §4.03 hereof, if any such damage to the Premises, the Building or the Shopping Center is caused by or results from the negligent or intentional act or omission of Tenant or any of its employees, contractors, agents or licensees, then (a) the Rent shall not be abated or apportioned as aforesaid; and (b) Tenant shall pay to Landlord, upon demand and as Additional Rent, the cost of (1) any repairs and restoration made or to be made as a result of such damage, or (2) if Landlord elects not to restore the Premises, the Building, or the Shopping Center, as the case may be, all damages and losses that Landlord incurs as a result of such damage.

## ARTICLE IX - CONDEMNATION

§9.01    Right to Award. If any or all of the Premises are taken by the exercise of any power of eminent domain or are conveyed to or at the direction of any governmental entity under a threat of any such taking (a "Condemnation"), Landlord shall be entitled to collect, from the condemning authority, the entire amount of any award or consideration for such taking or conveyance, without deduction therefrom for any leasehold interest held by Tenant under this Lease. Landlord shall be entitled to conduct any Condemnation proceeding and any settlement connected therewith free of interference by Tenant; Tenant waives any right that it may otherwise have to participate therein. However, Tenant may seek, in a separate proceeding, a separate award on account of any damages or costs it incurs as a result of the Condemnation, so long as such separate award in no way diminishes or reduces any award or payment which Landlord would otherwise receive as a result of the Condemnation.

§9.02    Effect of Condemnation. The following provisions of this Section shall apply if (a) all of the Premises are covered by a Condemnation; (b) any portion of the Premises is covered by a Condemnation and the remainder is insufficient for the reasonable operation of Tenant's

22

business; (c) any portion of the Building is covered by a Condemnation and, in Landlord's reasonable opinion, it would be impractical to restore the remainder thereof; or (d) any portion of the Shopping Center is covered by a Condemnation and, in Landlord's reasonable opinion, it would be impractical to continue to operate the remainder of the Shopping Center thereafter. If any of the events described in the immediately preceding sentence shall occur during the Term, then the Term shall terminate on the date possession of the property covered by such Condemnation is taken by the condemning authority, and all Rent shall be apportioned and paid to such date. If there is a Condemnation and the Term does not terminate pursuant to the foregoing provisions of this Section, then the operation and effect of this Lease shall be unaffected by such Condemnation, except that the Minimum Rent shall be equitably reduced to reflect the impact on Tenant's use and operation of the Premises as a result of the area taken or conveyed by reason of such Condemnation.

§9.03    Interruption.  If there is a Condemnation, Landlord shall have no liability to Tenant on account of any (a) interruption of, or interference with Tenant's business upon the Premises, (b) diminution of Tenant's ability to use the Premises, or (c) other injury or damage sustained by Tenant as a result of such Condemnation; however Tenant shall be entitled to the rent abatement specified in Section 9.02 above.

## ARTICLE X - ASSIGNMENT AND SUBLETTING

§10.01  Consent.  Notwithstanding any reference in this Lease to assignees, subtenants, licensees, concessionaires, or similar persons or entities, Tenant may not assign any of its rights under this Lease or make or permit any sublease, license, mortgage, pledge or other transfer of any part of the Premises (any such assignment, sublease, transfer, etc., or attempted assignment, sublease, etc., being hereinafter collectively referred to as a "Transfer"), without first obtaining Landlord's written consent thereto, which consent shall not be unreasonably withheld, conditioned or delayed (unless said Transfer conflicts with the uses set forth on Exhibit D, in which case Landlord may withhold its consent in its sole discretion), provided Landlord may, in determining whether to so consent, take into consideration the proposed transferee's net worth, financial stability, retail experience and reputation in the business community as compared to that of Tenant hereunder. If consent to any one Transfer is given, such consent shall not extend to any subsequent Transfer. Landlord shall be entitled, in its sole and absolute subjective discretion, to condition any such consent upon the entry by such proposed transferee into an agreement with (and in form and substance reasonably satisfactory to) Landlord, by which the proposed transferee assumes all of Tenant's obligations hereunder. Any person or entity to whom any Transfer is attempted without such consent shall have no claim, right or remedy whatsoever hereunder against Landlord. Landlord shall have no duty to recognize any person or entity claiming by, under or through any such Transfer. The foregoing terms of this Section shall apply whether or not Landlord accepts Rent from, or performance of Tenant's other obligations by, such person or entity. The sale, assignment or other transfer of a controlling interest in the ownership of Tenant (if a corporation), the sale, assignment or other transfer of any general partnership interest in Tenant (if a partnership), limited liability company, or other entity), the conversion of Tenant to a limited liability company, limited liability partnership, or any other type of entity having limited liability, the sale of substantially all of Tenant's assets, and the merger of Tenant into another entity, after which merger Tenant shall not be the surviving corporation or partnership, limited liability company, or other entity – whether such sale, merger, etc. be by operation of law or otherwise – shall each be considered a Transfer for the purposes of this Lease. Notwithstanding any provision in this Lease to the contrary, Tenant may not seek consent for a Transfer if Tenant is in default under this Lease beyond any applicable notice or cure period. The provisions of this Section to the contrary notwithstanding, Tenant may, without the prior consent of Landlord, at any time assign or otherwise transfer this entire Lease or any portion thereof, to any parent, subsidiary or affiliate

23

corporation or entity; or to any corporation resulting from the consolidation, merger, or reorganization of Tenant into or with any other entity, or to any person, firm entity or corporation acquiring a majority of Tenant's issued and outstanding capital stock or a substantial part of Tenant's physical assets (each, a "Permitted Transfer"). As used herein, the expression "affiliate corporation or entity" means a person or business entity, corporate or otherwise, that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with Tenant. The word "control" means the right and power, direct or indirect, to direct or cause the direction of the management and policies of a person or business entity, corporate or otherwise, through ownership or voting securities, by contract or otherwise.

Nothing shall be deemed to prohibit or require the Landlord's consent to any redemption or issuance of additional stock of any class, the public trading of Tenant's stock, a private stock offering, Tenant's going from a privately held corporation to a publicly traded corporation, Tenant's going from a publicly traded corporation to a privately held corporation, any subsequent public offering of Tenant's stock, or any transfers of stock related to the foregoing, and such transactions shall not be deemed violations of this lease or give Landlord the option to terminate this Lease.

§10.02   Consent Procedure. Without conferring any rights upon Tenant not otherwise provided in this Article, any request by Tenant for approval to sell or sublet the Premises or to transfer or assign Tenant's interest in this Lease, shall be accompanied by a processing charge in the amount of $1,500.00 and the following: (a) particulars of the proposed Transfer, including its nature, effective date, and copies of all assignments, subleases, letters of commitment or intent; and (b) a description of the identity, net worth and previous business experience of the proposed transferee, including without limitation copies of the proposed transferee's then latest income, balance sheet and changes in financial position statements (with accompanying notes and disclosure of all material changes thereto), if available, and certified as accurate by the proposed transferee. Provided Tenant has met the foregoing requirements, Landlord shall use good faith efforts to respond to any request for consent to an assignment by Tenant within fourteen (14) days after Landlord's receipt thereof. In addition, Tenant shall be responsible for paying for Landlord's reasonable outside attorney fees limited to a maximum of $3,000.00 (limit increased annually by 3% beginning on the Rent Commencement Date) that Landlord may incur in reviewing the foregoing materials and in granting or denying its consent hereunder, including those for drafting or reviewing the documents granting or denying such consent. Any consent by Landlord to an assignment, sublease or other transfer of this Lease shall be deemed further conditioned upon the following: (i) at the time of the assignment or subletting, any default of Tenant hereunder shall be cured, and (ii) delivery to Landlord of a writing in form and substance reasonably satisfactory to Landlord pursuant to which any assignee expressly assumes all obligations of Tenant hereunder or any sublessee expressly acknowledges that it is subject to all terms of this Lease. Notwithstanding Landlord's consent to any sublease or assignment, Tenant and any predecessor to Tenant that has not been expressly released from liability hereunder shall remain fully liable under this Lease and shall not be relieved of any of the obligations or covenants of the tenant hereunder. Tenant shall not in any way modify a sublease previously consented to without Landlord's prior written consent.

## ARTICLE XI - RULES AND REGULATIONS

Subject to this Article XI, Landlord shall have the right to impose and subsequently modify, from time to time and at its sole and absolute subjective discretion, reasonable rules and regulations governing the use of the Shopping Center ("Rules and Regulations"). Tenant shall comply with such Rules and Regulations and require its agents, employees, invitees and licensees to do so. The

initial Rules and Regulations are attached hereto as Exhibit F. Landlord agrees that all Rules and Regulations shall be reasonable and shall be promulgated and enforced in a non-discriminatory manner as to similarly situated tenants. Further, Landlord's right to amend or promulgate Rules and Regulations shall be subject to the condition that no such rule or regulation, whether pertaining to the Premises or the Shopping Center, shall materially increase any of Tenant's obligations under this Lease nor materially decrease any of Tenant's rights hereunder or otherwise be inconsistent with this Lease.

## ARTICLE XII - MORTGAGE LENDERS

§12.01   Subordination. This Lease shall be subject and subordinate to the lien, operation and effect of each Mortgage, automatically and without the necessity of any further action by either party hereto. However, if the mortgagee or beneficiary under any Mortgage (a "Mortgagee") succeeds to the interest of Landlord hereunder through foreclosure or otherwise, then, at the request of such Mortgage, Tenant shall attorn to such Mortgagee and recognize such Mortgagee as the Landlord under this Lease, and this Lease shall continue in full force and effect as a direct lease between such Mortgagee and Tenant upon all of the terms of this Lease, except that such Mortgagee shall not be (a) liable for any act, omission or default of any prior Landlord or any other event occurring prior to such Mortgagee's succeeding to the interest of Landlord hereunder; (b) subject to any counterclaim, defense, recoupment or offset to the extent the same relates to any time prior to such Mortgagee's succeeding to the interest of Landlord hereunder; (c) bound by any payment of Rent for more than one month in advance (unless actually received as such by the Mortgagee); (d) bound by any modification or amendment of this Lease, unless such modification or amendment shall have been approved in writing by the Mortgagee or shall have been entered into and effective prior to the creation of such Mortgagee's Mortgage; (e) obligated to construct all or any portion of the Space Improvements or to grant any credit toward the cost of the Space Improvements; (f) in the event of damage to the Shopping Center by fire or other casualty, obligated to repair the Premises or the Shopping Center beyond such repair as may be reasonably accomplished with the net proceeds of any insurance policy therefor not applied toward the amount due under such Mortgagee's Mortgage or under any Mortgage prior in title thereto; or (g) in the event of partial condemnation, obligated to repair the Premises or the Shopping Center beyond such repair as may be reasonably accomplished with the net proceeds of any award therefor not applied toward the amount due under such Mortgagee's Mortgage or under any Mortgage prior in title thereto. A "Mortgage" is a mortgage, deed of trust, ground lease or similar instrument now or hereafter granted by Landlord and encumbering all or part of the Shopping Center or any renewal, modification or extension thereof. Tenant's subordination under this Section 12.1 shall be conditioned upon Tenant's receipt of a Non-Disturbance Agreement ("SNDA") on the applicable Mortgagee's form, providing, in effect, that Tenant's right to use and occupy the Premises will not be deprived as a result of such termination or foreclosure, so long as Tenant shall not be in default of this Lease. Tenant agrees to return a fully executed original SNDA to Landlord within ten (10) days of Tenant's receipt of the applicable form thereof. Tenant may request but shall have no right to require any changes to the SNDA form proposed by the Mortgagee. Landlord represents that as of the date of this Lease, there is no current Mortgagee in connection with the Shopping Center.

§12.02   Written Agreement. Tenant shall, within seven (7) days after request by Landlord or any Mortgagee, execute, acknowledge and deliver an SNDA or the Approved SNDA and/or shall provide such other information and certifications as are reasonably requested. Any Mortgagee may at any time subordinate the lien of its Mortgage to the operation and effect of this Lease, without obtaining Tenant's consent thereto, in which event this Lease shall be deemed to be senior to such Mortgage without regard to their respective dates of execution, delivery and/or recordation.

25

§12.03   Estoppel Certificate.   Each of Landlord and Tenant agrees from time to time, upon not less than fifteen (15) days' prior written request by the other party, to execute, acknowledge and deliver to the other party a commercially reasonable statement in writing certifying that this Lease is unmodified and in full force and effect and that Tenant has no defenses, offsets or counterclaims against its obligations to pay the Minimum Rent, Additional Rent and any other charges and that neither Landlord nor Tenant has any defenses to its obligation to perform its other covenants under this Lease (or, if there have been any modifications that the same is in full force and effect as modified and stating the modifications and, if there are any defenses, offsets, or counterclaims, setting them forth in reasonable detail), the dates to which the Minimum Rent, Additional Rent and any other charges have been paid, and such other matters as either party may reasonably request. Any such statement delivered pursuant to this §12.03 may be relied upon by any prospective purchaser or mortgagee of the Shopping Center or any prospective assignee of any such mortgage or any other party with an interest in the Premises. The estoppel certificates shall be prepared and delivered at the expense of the complying party; provided however, if either party requests more than two (2) estoppel certificates from the other party in any Year that require a separate review of the matters contained therein, the requesting party agrees to pay the other party the sum of Two Hundred Fifty and 00/100ths Dollars ($250.00) for each additional estoppel certificate requested in such Year.

## ARTICLE XIII - ENVIRONMENTAL COVENANTS

§13.01   Prohibitions.   Neither Tenant nor its employees, licensees, invitees, agents or contractors shall use, manufacture, release, store or dispose of, on, under or about the Premises, any explosive, flammable substance, radioactive material, asbestos in any form, paint containing lead, materials containing urea formaldehyde, polychlorinated biphenyls, or any other hazardous, toxic or dangerous substances, wastes or materials, whether having such characteristics in fact or defined as such under laws or regulations (collectively, "Hazardous Materials"). However Tenant may store and use cleaning fluids of the type sold in supermarkets or otherwise used lawfully, in retail complexes, provided that Tenant does so in a safe and lawful manner without contaminating the Premises or the environment. Without limiting the foregoing, Tenant agrees (a) to notify Landlord immediately in the event any Hazardous Materials are released or spilled on or about the Premises; (b) to monitor and clean up, immediately, any such releases and spills in compliance with all laws and governmental directions and subject to such instructions (if any) as Landlord may provide; (c) to obtain promptly such evidence or governmental approvals, that such clean-up has been completed in compliance with all laws and governmental directions, as Landlord may require; (d) to deliver to Landlord, in each instance within three (3) Business Days after Tenant's receipt thereof, copies of any and all notices received by Tenant relating to any actual or alleged contamination of the Premises; and (e) simultaneously with delivering any monitoring report or notice to any governmental agency as to any Hazardous Materials or the operation of the Premises with respect thereto, to deliver a copy thereof to Landlord.  Tenant shall defend, indemnify, and hold Landlord harmless against and from any liability, damage, cost, expense, injury, suits, claims, or demands (including, without limitation, attorneys' fees) resulting from Tenant's use, storage, release, or movement of Hazardous Materials. This Section will survive the expiration or earlier termination of this Lease.

§13.02   Inspection.   In addition to its other rights under this Lease, Landlord may enter upon the Premises at any time for the purposes of inspecting for Hazardous Materials. If Landlord discovers the existence of any actual or potential Hazardous Materials due to fault or other act of Tenant or its agents, employees, invitees or licensees, then Tenant shall reimburse Landlord upon demand as Additional Rent for the costs of such inspection, sampling and analysis, including the reasonable cost of necessary environmental studies (i.e. Phase I and Phase II).

**§13.03   Landlord's Obligations.** Landlord warrants that the Premises will comply with all laws, rules, regulations applicable to Hazardous Materials on the Delivery Date. Subject to the remaining provisions of this Lease, Landlord shall defend, indemnify and hold harmless Tenant and its successors and assigns, from and against any and all liabilities, actions, demands, penalties, losses, costs and expenses (including reasonable counsel fees, consultants' fees and remedial costs), suits, costs of any settlement or judgment and claims which may be paid, incurred or suffered by or asserted against Tenant or its successors and assigns, as a result of the presence on or under the Premises or the Shopping Center of any Hazardous Materials existing prior to the Delivery Date. Landlord shall remove, clean-up and remedy any Hazardous Materials in the Premises or the Shopping Center to the extent and in the manner required by any law, rule, regulation applicable to Hazardous Materials, if the presence of such Hazardous Materials resulted from the action or inaction of Landlord, its employees, contractors, subcontractors, agents, or licensees. In the event that Hazardous Materials which are required by any laws, rules, regulations applicable to Hazardous Materials to be removed or remediated are introduced to any part of the Shopping Center (other than the Premises) by a party other than Tenant, its, agents, employees, contractors or invitees, Landlord shall pursue the party or parties responsible for such contamination in an effort to compel them to remediate the contamination in accordance with all applicable laws, rules, regulations applicable to Hazardous Materials. In the event of substantial, material or unreasonable interference as a direct result of Landlord's activities pursuant to this Section 13.03, the Minimum Rent and Additional Rent due hereunder shall be fully abated if the interference continues for more than three (3) days after Landlord's receipt of written notice thereof.

## ARTICLE XIV – DEFAULT AND REMEDIES

**§14.01   Default.** Each of the following shall constitute an "Event of Default":

(a)   Tenant fails (1) to make one or more payments of Rent when and as due and payable hereunder, or (2) to perform or observe any one or more of its other obligations under this Lease when and as due hereunder; or

(b)   Tenant or any guarantor of this Lease (1) applies for or consents to the appointment of a receiver, trustee or liquidator of Tenant or such guarantor or of all or a substantial part of the assets of Tenant or such guarantor and such receiver, trustee or liquidator is not dismissed within sixty (60) days after the appointment thereof; (2) is subject to a petition in bankruptcy and such petition is not dismissed within sixty (60) days after the filing thereof; (3) admits in writing its inability to pay its debts as they come due; (4) makes an assignment for the benefit of its creditors; or (5) files a petition or an answer seeking a reorganization or an arrangement with creditors or otherwise seeks to take advantage of any insolvency law as to its own indebtedness or obligations and such petition is not dismissed within sixty (60) days after the filing thereof.

**§14.02   Grace Period.** Notwithstanding anything contained in this Article, and except in the case of Section 4.01 (Tenant's Insurance) and Section 13.01 (Environmental Covenants) upon the occurrence of an Event of Default, Landlord shall not exercise any right or remedy which it has under any provision of this Lease or applicable law unless and until:

(a)   Landlord has given written notice thereof to Tenant; and

27